IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

FRANK T. WHITEHEAD,

                Plaintiff,                      OPINION AND ORDER

    v.

                                                      21-cv-100-wmc

LARRY FUCHS, CO SCOTT,
LUCINDA BUCHANAN, GARETH
FITZPATRICK, DR. JUSTIN RIBAULT,
and MICHAEL FINK,

                Defendants.

On March 19, 2021, the court granted *pro se* plaintiff Frank T. Whitehead, an inmate at Columbia Correctional Institution ("CCI"), leave to proceed with this civil rights lawsuit on claims arising under the Eighth Amendment and state-law negligence following his allegedly suffering a knee injury. (Dkt. #8.) Whitehead requested preliminary injunctive relief. (Dkt. #3.) Following the grant of leave to proceed, defendants filed requested records related to plaintiff's medical treatment for the alleged injury and ongoing knee pain. (Dkt. #13.) Based on those records, defendants now ask the court to dismiss plaintiff's claims as a sanction for abusing the judicial process on the ground that material allegations in support of his motion for injunctive relief were demonstrably false. (Dkt. #12 at 16-21.) In response, plaintiff effectively concedes that a significant part of his recent treatment history was left out of his initial request for preliminary relief, but blames the inmate who assisted him in preparing these submissions and argues that his case should still be allowed to proceed. (Dkt. #14.)

Based on its review of plaintiff's treatment records and the parties' submissions and the fact that neither party requests a hearing, the court concludes that a hearing would not further assist it in reaching a decision. *See Kapco Mfg. Co. v. C & O Enterprises, Inc.*, 886 F.2d 1485, 1495 (7th Cir. 1989) (in the context of a request for sanctions, party is entitled to notice and opportunity to respond but a live hearing is necessary only if "it could assist the court in its decision"). Moreover, for reasons the follow, the court will deny plaintiff's request for injunctive relief (dkt. #3) and dismiss his complaint with prejudice as a sanction.[1]

## RELEVANT BACKGROUND[2]

Whitehead alleged that on July 31, 2020, he slipped on a "slick rock" while jogging in Columbia's recreation yard and badly twisted his knee. Although his injury was allegedly acute, he further claims that the guard he initially informed, CO Scott, told him to submit a health service requests ("HSR") because "all the nurses are gone," despite doing nothing to confirm whether this was true. (Dkt. #1 at 5.) Whitehead then returned to his unit, and he allegedly sought treatment over the next few days by submitting HSRs on August 3, August 4, and August 6. Finally, having still not been seen by anyone from the Health Service Unit ("HSU"), he asked to speak with the Warden on August 9.

---

[1] Because the court will dismiss plaintiff's complaint, his request to sanction defendants and their lawyer for allegedly covering up the rock he slipped on with new gravel before photos could be taken of the area will also be denied as moot. (Dkt. #21.)

[2] The allegations raised in Whitehead's complaint and declaration set forth in detail in the court's March 19 screening order are incorporated here. (Dkt. #8 at 2-4, 10-11.) Nevertheless, this brief background is provided for context.

In response to his earlier HSRs, Whitehead was apparently repeatedly told that he was "scheduled to be seen," and on August 10, 2020, Dr. Justin Ribault did in fact see Whitehead. Following inspection of his knee, Ribault ordered a knee sleeve and prescribed the pain medication Naproxen. Even so, Whitehead alleged that he remains in severe pain, his knee continues to swell, and he has "a serious limp and permanent damage," yet he has received no follow-up medical care nor been referred to a specialist for an assessment. (Dkt. #1 at 7.)

Based on these and other relevant allegations, as well as his request for a preliminary injunction, the court prioritized Whitehead's case, allowing him to proceed on Eighth Amendment deliberate indifference and state-law negligence claims against defendants Scott, Ribault, HSU Manager Linda Buchanan, and Assistant HSU Manager Gareth Fitzpatrick. (Dkt. #8 at 11.) Whitehead is also proceeding against Warden Larry Fuchs for his alleged failure to maintain a safe recreation yard. (Dkt. #8 at 9-10.) Finally, the court ordered defendants to respond to Whitehead's motion for preliminary relief before their answer was due by submitting documentation of Whitehead's "past and current treatment for his alleged knee injury, swelling, and ongoing knee pain," including the results of any imaging tests and any attempts to secure treatment by a specialist. (Dkt. #8 at 1.)

Defendants complied with the court's order, as well as filed a brief in opposition to Whitehead's preliminary injunction motion. (Dkt. ##12, 13.) The treatment records provided by defendants indicate that Whitehead actually has suffered from a chronically arthritic left knee for some time, and he underwent the following testing, evaluation, and

treatment *before* filing his complaint, motion for preliminary injunctive relief, and supporting declaration in this lawsuit on February 11, 2021:

- Whitehead saw a nurse on May 18, 2020, for joint paint due to arthritis and stated that Naproxen, his pain reliever, was "not consistently working." (Dkt. #13-1 at 33.) The nurse documented some swelling in his left knee, but Whitehead had full range of motion, so the nurse encouraged Whitehead to continue Naproxen and indicated that she would refer him to a provider for further evaluation. (Dkt. #13-1 at 34-35.)

- Whitehead saw a doctor on June 24, 2020, who ordered a knee sleeve and prescribed lidocaine topical cream to help relieve his chronic knee pain. (Dkt. #13-1 at 17-18.) He received that cream on July 7. (Dkt. #31-1 at 41.)

- After Whitehead allegedly injured his knee on or about July 31, 2020, he submitted an HSR on August 3 stating that he had been asking for a knee brace for six months, and that his knee was hurting and swollen after recently "twisting it." (Dkt. #13-3 at 55.) He further followed up with subsequent HSRs on August 4, 6, and 9, asking to be seen and noting that he had to take "extra pain pills." (Dkt. #13-3 at 52-54.) Also on August 9, Whitehead sent an information request to Warden Fuchs informing him of the knee injury and that he had yet to been seen. (Dkt. #4-2 at 1.)

- As alleged, Whitehead saw Dr. Ribault on August 10, Whitehead reporting that he recently twisted his left knee, resulting in pain and swelling with some improvement, but also acknowledging his underlying arthritis. (Dkt. #13-1 at 17.) The doctor noted some mild swelling, but a normal gait, and further observed that a knee sleeve order was pending. (Dkt. #13-1 at 17.) In the meantime, Dr. Ribault gave Whitehead an ace wrap bandage, ordered x-rays and physical therapy, and gave "reassurance" regarding his knee. (Dkt. #13-1 at 17.)

- The next day, August 11, Whitehead was also fitted for a knee brace. (Dkt. #13-1 at 36.)

- In addition, Whitehead had x-rays taken of his left knee on August 25, 2020, which were compared to previous x-rays taken approximately one year earlier. (Dkt. #13-1 at 91.) These images confirmed Whitehead's degenerative joint disease, but indicated no "evidence of acute fracture," dislocation, or "lytic or blastic lesions in the bones." (Dkt. #13-1 at 91.)

- Moreover, on August 27, 2020, Dr. Ribault reviewed the x-ray report, noting "[l]eft knee arthritis per x-ray noting a chronic issue." (Dkt. #13-1 at 17.) In his

- declaration, Dr. Ribault further attests that the x-rays "provided objective diagnostic evidence that Whitehead had *not* suffered an acute injury when he reported twisting his knee." (Dkt. #13 at 6.)

- In response to an additional request from Whitehead, Dr. Ribault next added a lower bunk restriction on November 4, 2020. (Dkt. #13-1 at 37, #13-3 at 31.) In light of the x-ray findings and physical therapy referral, however, the doctor did not also order an MRI at that time. (Dkt. #13-1 at 37.)

- However, on November 10, 2020, when Whitehead complained to Dr. Ribault that he continued to have difficulty sitting up or being active with any left knee involvement, the doctor requested an MRI. (Dkt. #13-1 at 15-16, 80.)

- Whitehead had an MRI on December 1, 2020, which showed a left meniscus tear. (Dkt. #13-1 at 89.) Because the MRI report recommended correlation with x-rays, Whitehead was then scheduled to see a specialist for further x-rays, as well as an evaluation and treatment based on this new diagnostic imaging. (Dkt. #13-1 at 80-81.)

- On January 13, 2021, Whitehead saw an orthopedic specialist who performed a comprehensive physical examination. (Dkt. #13-2 at 1.) Whitehead also had new x-rays taken of his left knee, which the specialist compared to the MRI. (Dkt. #13-2 at 4.) Those x-rays again confirmed Whitehead's degenerative joint disease in his left knee, but found "[n]o evidence of acute traumatic change." (Dkt. #13-2 at 7.) The specialist reported having "[a] detailed discussion" with Whitehead about his diagnosis and potential treatment options." (Dkt. #13-2 at 5.) The specialist recommended "conservative management," "formal physical therapy," and continuing his pain medication "as needed," and it was noted Whitehead agreed with this approach at the time. (Dkt. #13-2 at 4-5.) In addition, the specialist administered a steroid injection into Whitehead's left knee, noting that Whitehead "had immediate relief and tolerated the procedure well." (Dkt. #13-2 at 5.)

- Nevertheless, Whitehead submitted another HSR the very next day, January 14, noting that he had seen a specialist "on the outs" the day before and requesting documentation of the side effects of the steroid injection and of "what [plaintiff's] two x-rays show[]." (Dkt. #13-2 at 17.)

Since filing his complaint and motion for preliminary injunctive relief on February 11, 2021, Whitehead began physical therapy on February 26. (Dkt. #13-1 at 77.) At his initial appointment, Whitehead reported that: his knee pain began after he suffered an injury in November 2020; his knee buckles when he descends stairs; and he had received

5

a steroid injection "1 month before" and noted "pain relief." (Dkt. #13-1 at 77.) At the end of that therapy session, PT recommended a home exercise program for strengthening, with a follow-up in 8 to 12 weeks. (Dkt. #13-1 at 77-78.)

Soon after, Whitehead submitted additional HSRs related to his ongoing knee pain. In particular, Whitehead complained of leg cramps from the steroid injection on March 9, 2021, and was scheduled by HSU to see a provider. (Dkt. #13-3 at 5.) On March 23, Whitehead submitted a related HSR renewing his complaint of leg cramps, noting that the PT exercises were painful and requesting knee replacement surgery. (Dkt. #13-3 at 4.) In response, Whitehead was reminded that the specialist made no recommendation for surgery. A week later, on March 30, Whitehead saw a medical provider for mild Covid-19 symptoms and reported little benefit from the steroid injection. (Dkt. #13-1 at 15.) That provider changed Whitehead's Naproxen prescription to acetaminophen, as well as assured him that she would follow up with him in June about his knee pain. Whitehead attests that this new provider had encouraged him to continue with his physical therapy, and he felt "like she really cared what I was dealing with." (Dkt. #14 at 4.)

As for the information omitted from his complaint and from materials in support of his motion for injunctive relief, Whitehead states that he entrusted someone else to prepare these filings and he did not have all of the treatment records defendants produced. (Dkt. #14 at 1.) By way of further excuse, Whitehead represents that his institution went on lockdown due to the Covid-19 pandemic, and he personally contracted the virus, so by the time he was able to retrieve his papers from the inmate who drafted his filings, Whitehead says he was stressed and upset by these recent experiences and "may have not even noticed

the things left out." (Dkt. #14 at 1.) Finally, Whitehead complains that x-rays were initially taken of the wrong knee, and that even though this mistake was corrected that the same day, he was still billed for the x-rays, adding that a prison guard encouraged him to seek a knee replacement. (Dkt. #14 at 2-3.)

OPINION

I. Motion for Preliminary Injunctive Relief (dkt. #3)

For obvious reasons, the court will deny plaintiff's motion for preliminary injunctive relief. While plaintiff attests in his declaration that he is "being denied adequate medical treatment" and would like the court to order defendants to arrange for his knee to be evaluated by "a qualified specialist," as well as carry out whatever treatment plan the specialist recommends (dkt. #4 at 1-2), this already occurred before he ever filed suit. Indeed, it is undisputed that plaintiff saw an orthopedic specialist *less than a month* before seeking an order for preliminary injunction and he has wholly failed to show that "an irreparable harm will result if the injunction is not granted." *Lambert v. Buss*, 498 F.3d 446, 451 (7th Cir. 2007).

Similarly, rather than supporting a claim for deliberate indifference, the undisputed medical records show that: plaintiff has undergone extensive long-term care for chronic arthritis in his left knee; repeated diagnostic imaging failed to provide any evidence of a traumatic injury; and he continues to receive treatment for his arthritic knee.[3] In fairness, there was a delay of several days after plaintiff's alleged fall in the recreation yard before

---

[3] Even the finding of a "meniscus tear" on the MRI was later assessed by a specialist as "degenerative" rather than evidence of an acute traumatic change. (Dkt. #13-2 at 4.)

7

he was seen by a doctor on August 10, and plaintiff's inmate complaint about that delay was affirmed by CCI, but plaintiff reported some improvement at the delayed visit, and the HSU doctor addressed plaintiff's complaint by ordering x-rays and physical therapy, and plaintiff received the previously ordered knee sleeve by August 18.  Moreover, x-rays taken approximately two weeks later were compared to x-rays taken the year before his alleged mishap in CCI's recreation yard, ruling out an acute injury, such as dislocation or fracture.  Then, in November of 2020, plaintiff received a lower bunk restriction, and an MRI scan was ordered and completed by early December.

      Notably, while plaintiff swore in support of his motion that he had *not* been referred to a "qualified specialist" or to physical therapy (dkt. #4 at 2), it is now undisputed that he was actually evaluated by an outside orthopedic specialist just one month *before* filing this lawsuit, who examined plaintiff as well as his MRI and x-rays, gave plaintiff a steroid injection in his knee, and recommended "conservative management" in the form of physical therapy and pain medication as needed (dkt. #13-2 at 4-5).  Finally, plaintiff has since begun physical therapy, and he has seen a new provider who changed his pain medication, encouraged him to continue with his exercises, and was scheduled to follow up with him in June regarding his progress.

      In short, plaintiff had already received the relief he sought in his motion for preliminary injunction *before* he asked for court intervention, and the specialist's recommended treatment plan appears to be in place.  On this record, the court has *no* basis to infer that plaintiff is not receiving adequate follow-up treatment nor that imminent, irreparable harm will result if plaintiff does not soon see a second specialist.  Granting a

preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 389 (7th Cir. 1984). Plaintiff may have been hoping for a different treatment recommendation, such as a knee replacement, but mere disagreement with the specialist is not just insufficient to justify injunctive relief, it would defeat his underlying claim altogether if those facts were undisputed at summary judgment. *See Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) ("neither medical malpractice nor a mere disagreement with a doctor's medical judgment amounts to deliberate indifference"). Accordingly, plaintiff's preliminary injunction motion must be denied.

## II. Defendants' Request for Sanctions

That leaves a more difficult question: whether plaintiff's significant, material misrepresentations and omissions in his sworn declaration in support of the motion for injunctive relief merit the sanctions defendants request, including dismissing this case with prejudice and issuing plaintiff a strike under the PLRA. Certainly, the court has the inherent power to sanction a party's misconduct, *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 739 (7th Cir. 2009), and "[s]anctions meted out pursuant to the court's inherent power are appropriate where the offender has willfully abused the judicial process or otherwise conducted litigation in bad faith." *Id*. Moreover, "[a] litigant's misconduct can justify default judgment, *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639 (1976), and perjury is among the worst kinds of misconduct," *Rivera v. Drake*, 767 F.3d 685, 686 (7th Cir. 2014).

9

Defendants rightly acknowledge that dismissal with prejudice is an extreme sanction. *See Greyer v. Illinois Dep't of Corr.*, 933 F.3d 871, 877 (7th Cir. 2019) ("As we have stressed, in all but the most extreme situations courts should consider whether a lesser sanction than dismissal with prejudice would be appropriate."). That is why the Supreme Court repeatedly has "cautioned that the use of inherent powers should be 'exercised with restraint and discretion.'" *Trade Well Int'l v. United Cent. Bank*, 778 F.3d 620, 626 (7th Cir. 2015) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)). Here, this is especially true given plaintiff's *pro se* status. *See Schilling v. Walworth Cty. Park & Planning Comm'n*, 805 F.2d 272, 277 (7th Cir. 1986) ("The need for the district court to exercise discretion in deciding among alternative sanctions was especially great in this case, given the plaintiff's *pro se* status.").

Even so, defendants argue that dismissal is appropriate and proportional because plaintiff filed a baseless motion for injunctive relief, causing the court and defendants immediately to waste time and resources diverted from other, more pressing matters, and monetary sanctions would not be effective against a plaintiff proceeding *in forma pauperis*. On this record, the court is inclined to agree. Specifically, in his sworn declaration in support of the motion for injunctive relief, made under penalty of perjury, plaintiff attests that despite submitting five HSRs after slipping on a rock: (1) he has "been ignored;" (2) he has received only Naproxen "which barely helps with the pain;" (3) he has a "permanent limp" due to a lack of medical care; (4) he has not "been referred to a qualified specialist" with expertise in bone and knee injuries or to physical therapy; (5) and HSU staff has refused him "medical care outside the prison unless his medical condition is life

threatening." (Dkt. #4.) In the motion itself, plaintiff similarly alleges that he has been "ignored," denied "appropriate medical care and medication," and has not been "referred to a qualified specialist for a [consultation] or even [to] assess and treat his knee injury." (Dkt. #3 at 1.) The complaint also falsely alleges that plaintiff has "not received further medical care or seen a specialist" after August 10, 2020. (Dkt. #1 at 7.) These allegations are not just demonstrably false, they are outrageously so, and despite plaintiff's attempts to do so, he had offered no explanation for why he would not have known or remembered any of the details of recent medical treatments, including some occurring within a month of filing these false statements.

      Nor can the court conceive of an acceptable explanation for plaintiff signing each of these filings under oath on February 3, 2021, about five months after he was allegedly injured in the recreation yard, much less filing them in this court on February 11. (Dkt. ##1 at 9, 3 at 6, 4 at 2.) Briefly, by then plaintiff had already undergone an initial post-injury consult with Dr. Ribault, was taking Naproxen and had a knee sleeve. Contrary to his allegations, plaintiff had also received a lower bunk restriction, a physical therapy referral, and several rounds of diagnostic imaging, including two sets of x-rays and an MRI scan, which ruled out any acute injury. Moreover, plaintiff had been seen and examined by an independent orthopedic specialist, who reviewed plaintiff's imaging tests, gave plaintiff a steroid injection, and concurred with Dr. Ribault in recommending a conservative treatment plan to include physical therapy. Simply put, plaintiff lied about and omitted from his filings virtually every material fact regarding months of treatment after his initial visit with Dr. Ribault right up to the month of filing.

Finally, to the extent plaintiff would fault defendants for once taking an x-ray of the wrong knee, that mistake was corrected and regardless does not alter his own material misrepresentations and omissions. As for his court filings, plaintiff's excuse that another inmate prepared them without the benefit of his full medical record, and that plaintiff could not easily converse with this inmate in the interim due to a lockdown at their institution rings hollow, as well as meaningless, given that he signed his own declaration under oath. Moreover, as plaintiff acknowledges, those circumstances do not excuse him from reviewing his filings carefully before signing them, especially under penalty of perjury. Further, plaintiff adds that he was stressed by the pandemic and from contracting Covid-19, speculating that he "may not have even noticed" the omissions. (Dkt. #14 at 1.) To that point, the court is generally sympathetic to the challenges inmates have faced during the pandemic. The court may even have been sympathetic to plaintiff's position here were this a case in which the omissions were fewer, involved long ago events that might be difficult to recall without records, or did not go to the very heart of his claims and requests for relief. But that is not this case. Here, plaintiff signed and filed a pleading, declaration, *and* motion in February 2021, each alleging that he had not received follow-up medical care and needed to be seen by a specialist, even though he had to know those allegations were patently false. Even if the court were somehow to accept the unacceptable -- that plaintiff may have inadvertently missed the problem with his filings at first -- he had the benefit of the court's March 2021 screening order recounting those same allegations and ordering defendants to respond promptly to his motion for injunctive relief. (Dkt. #8.) Upon reading that order, it should have been obvious to plaintiff that the court had gotten

12

the essential facts wrong, obligating him at minimum to alert the court, if not amend his complaint and withdraw or amend his motion for injunctive relief. He did none of those things. Rather, he opposed defendants' request for sanctions without yielding any ground.

In light of the treatment records, it strains credulity to believe that the number of misrepresentations and omissions discussed above, all regarding events directly involving plaintiff during the five months leading up to the filing of this lawsuit, can be attributed to mere stress or oversight. Motions and other filings based on false allegations "undermine the essential truth-finding function of our system of justice." *Goodvine v. VandeWalle*, No. 16-C-890, 2018 WL 460121, at *8 (E.D. Wis. Jan. 17, 2018) (dismissing plaintiff's case and issuing a strike after concluding that plaintiff had manufactured a false declaration and lied under oath), *aff'd sub nom*. *Goodvine v. Carr*, 761 F. App'x 598 (7th Cir. 2019); *see also Hoskins v. Dart*, 633 F.3d 541, 544 (7th Cir. 2011) (affirming the dismissal of a suit in which the plaintiff lied about his litigation history and applicability of the prepayment requirement in 28 U.S.C. § 1915(g)); *Ayoubi v. Dart*, 640 F. App'x 524, 526 (7th Cir. 2016)(affirming dismissal with prejudice as sanction for lying to court that officials had "totally ignored" prior order directing officials to grant detainee reasonable access to law library). It also puts the court through unnecessary work and causes defendants, who produced an affidavit from Dr. Ribault, an opposition brief and hundreds of pages of medical records before their answer was due, "unnecessary expense and delay" of other matters. *Rivera*, 767 F.3d at 686. The court has numerous cases brought by parties who, like plaintiff, want immediate attention. Plaintiff's attempt to jump to the front of the line and secure preliminary relief by submitting a false narrative diverted court resources away

from other cases. A dramatic sanction is appropriate not just as to this litigant, but as a message to others tempted to so the same.

As noted above, the court is required to consider other, lesser sanctions before dismissing the case, *see Rivera*, 767 F.3d at 686, but a lesser sanction would not be effective. For instance, as noted, plaintiff is proceeding *in forma pauperis*, so it is unlikely that a monetary sanction would work. *See id.* at 687 (because the plaintiff is litigating in forma pauperis, "financial sanctions under Fed. R. Civ. P. 56(h) could not work."). And merely denying plaintiff's motion for injunctive relief or allowing him to amend his complaint and proceed would not provide much incentive to be honest and forthright in the future. Finally, given plaintiff's blatant lies about crucial factual matters in this case that will surely destroy any credibility he might have had before a jury, not to mention the undisputed glaring weaknesses in this case as documented in his own medical records, there would appear to be little, if anything, left to his lawsuit.

Accordingly, the court finds, after deliberate consideration, that the only reasonable sanction in this case is its dismissal with prejudice. Defendants also ask for a strike under 28 U.S.C. § 1915(g), but a strike is unwarranted given the limited statutory grounds for which they may be assessed. *See* 28 U.S.C. §§ 1915(e)(2) (the action is frivolous, malicious, or fails to state a claim upon which relief can be granted). However, plaintiff should be aware that if he commits any misconduct in his other pending case *or* any future case he

files, the court can impose harsher sanctions, such as dismissal of other pending cases, as well as instituting a filing bar in this court.[4]

ORDER

IT IS ORDERED that:

1)  Plaintiff Frank T. Whitehead's motion for preliminary injunctive relief (dkt. #3) is DENIED.

2)  Plaintiff's request for sanctions (dkt. #20) is DENIED as moot.

3)  This case is DISMISSED with prejudice. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 14th day of September, 2021.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

---

[4] The court notes that Mr. Whitehead has two previous cases in addition to this one -- 13-cv-490 (dismissed without prejudice in favor of defendants); 17-cv-514 (dismissed in favor of defendants) -- in addition to one other open case, 20-cv-488. He also has previously filed a habeas petition in this court in 16-cv-229 (closed).